## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**DAVID ALLEN BESECKER, II,**

      **Plaintiff,**

**vs.**                       **CASE NO. 3:21-CV-916-MCR-MAF**

**KILOLO KIJAKAZI,**
**Acting Commissioner of**
**Social Security Administration,**

      **Defendant.**
_____/

## REPORT AND RECOMMENDATION

This Cause comes before the Court pursuant to 42 U.S.C. § 405(g) for review of the final determination of the Commissioner of the Social Security Administration ("Commissioner") denying David Besecker's applications for Title II, for a period of disability insurance benefits, and Title XVI, for supplemental security income benefits, under the Social Security Act. After careful consideration of the record, for the reasons stated below, the undersigned recommends that the Commissioner's decision be affirmed.

## I.   Procedural History

Besecker initially applied for Child Insurance Benefits in 2007. The Commissioner determined that Besecker was disabled beginning in January 2003 due to "affective/mood disorders," specifically, bipolar disorder, and

"learning disorder." Tr. 72, 110-13, 136.[1] Years later, the Commissioner conducted a disability review and found that Besecker's disability ceased on April 1, 2019, because his health "improved" and he was "able to work." Tr. 114-25. Besecker argued that his disability continues. Tr. 126-32.

Besecker waived a disability hearing; therefore, a decision was made based on the evidence contained in the file.[2] Tr. 136. The disability hearing officer used December 21, 2010, as the comparison point decision (CPD) because it was "the most recent favorable medical determination for . . . [Besecker's] disability" and found that Besecker is able to perform unskilled work activity at any exertional level and was no longer disabled. Tr. 136-37.

Besecker requested an administrative hearing. On June 22, 2020, Administrative Law Judge (ALJ), James F. Barter, presided over the telephonic hearing. Tr. 44-71. Besecker was represented by counsel. Id. Besecker; his mother, Lori Besecker; and Sheila G. Justice, M.S., CDMS, an impartial vocational expert (VE), testified at the hearing. Tr. 47-59

---

[1] Citations to the transcript/administrative record, ECF No. 12, shall be by the symbol "Tr." followed by the page number that appears in the lower right corner.

[2] The Commissioner erroneously stated that the determination was upheld upon reconsideration after a disability hearing by a state agency disability hearing officer and cited to the same documents in the transcript. The Disability Hearing Officer's Decision clearly states "[t]he hearing was waived," thus, "no hearing was held." T. 134.

(Besecker's testimony); Tr. 60-65 (Lori Besecker's testimony); Tr. 66-70 (Justice's testimony); Tr. 305-06 (Justice's resume).

On December 11, 2020, the ALJ issued a decision denying Besecker's applications for benefits. Tr. 17-38. The ALJ purportedly considered "all of the evidence of record," including the medical records, and determined Besecker was not disabled after April 1, 2019. Tr. 20, 32. On May 27, 2021, the Appeals Council denied review making the ALJ's decision the final decision of the Commissioner. Tr. 1-4. Besecker filed his complaint with this Court on July 20, 2021. ECF No. 1. The Commissioner filed an answer on September 23, 2021. ECF No. 11. The parties filed memoranda of law, which have been considered. ECF Nos. 14, 18.

## II.   Besecker's Claims

Besecker claims that the Commissioner's decision should be reversed because the ALJ's determination that he was no longer disabled was not supported by substantial evidence. ECF No. 14, pp. 1, 7. Besecker previously received disability benefits through April 1, 2019. Id., p. 3. Besecker argues that his disability continues due to bipolar disorder, borderline intellectual functioning, learning disorder, and seizure disorder. Id.

According to Besecker, the ALJ's decision should have been based upon the medical evidence and the statements of Dr. Scott Thomas and

Dr. Jacques Baillargeon, Besecker's long-time treating physicians. Id., p. 6. According to both doctors, Besecker is disabled and unable to engage in any substantial gainful employment. Id. The ALJ found the physicians' opinions unpersuasive and unsupported by medical evidence. Id. Besecker argues that the ALJ failed to give his doctors' opinions the appropriate weight and could have requested a consultative examination by a psychiatrist, psychologist, or ordered additional testing. Id. Besecker maintains he is unable to hold a job at any competitive level on a substantial basis. Id. Thus, the Court should reverse the ALJ's decision. Id.

## III.   Commissioner's Claims

The Commissioner argues that the ALJ properly considered the evidence; and the Court may not reweigh the evidence. ECF No. 18, pp. 1-2. Besecker is not disabled because he works part time, cares for his eleven-year-old daughter, and maintains a home he shares with his family. Id., p. 1. Specifically, the ALJ found that "[Besecker] did not have an impairment or combination of impairments that met or medically equaled any of the listed impairments in 20 C.F.R. pt. 404, subp. P, app. 1"; and "medical improvement occurred." Id., p. 4. Also, according to the ALJ, Besecker has the residual functional capacity (RFC) "to perform a full range of work at all exertional levels," with certain non-exertional limitations, and is "able to

perform a significant number of jobs in the national economy." Id. (citing Tr. 22, 24, 66-68).

The Commissioner argues that the ALJ considered the medical evidence including the opinions of Dr. Thomas, Dr. Baillargeon, and the state agency psychological consultants who reviewed the record in 2019. Id., pp. 16-17. Dr. Baillargeon's 2020 opinion was unpersuasive because he last treated Besecker in 2010; and "his objective observations revealed a largely unremarkable mental status at the time." Id., p. 17. Although, Dr. Baillargeon concluded "that [Besecker] is unable to work" this was "inconsistent with ongoing part-time work activity" and the record as a whole. Id. Dr. Thomas' opinion that Besecker was unable to work was unsupported by the record because Besecker saw him only twice per year for conservative treatment. Id., p. 18.

The Commissioner maintains that the ALJ was not required to order a consultative examination because the record contains sufficient evidence to make an informed decision. Id., p. 19. Besecker has the burden to support his claims. Id., p. 20. Remand is unwarranted because there is no evidentiary gap which resulted in unfairness or clear prejudice; and Besecker has not demonstrated that additional information was required. Id., pp. 19-20. Only

substantial evidence is necessary to support an ALJ's finding. Id. Accordingly, the Court should affirm the decision. Id., pp. 6-21.

## IV.  Legal Standards Guiding Judicial Review

A claimant's continued entitlement to disability benefits must be reviewed periodically. 20 C.F.R. § 404.1594(a). The Commissioner may terminate a claimant's benefits upon a finding that there has been a medical improvement in the claimant's impairment or combination of impairments related to the claimant's ability to work and the claimant is now able to engage in substantial gainful activity. 42 U.S.C. § 423(f)(1). The entitlement to disability benefits ends when the claimant's medical condition improves sufficiently to permit him to engage in substantial gainful activity. Id.

Thus, the ALJ must determine if there has been any medical improvement in the claimant's impairments since the claimant was first determined to be disabled and, if so, whether the medical improvement is related to the claimant's ability to work. See 20 C.F.R. § 404.1594(a). Medical improvement means "any decrease in the medical severity of . . . impairment(s) . . . present at the time of the most recent favorable medical decision that [the claimant was] disabled or continued to be disabled." Id. § 404.1594(b)(1). "Medical improvement is related to [the claimant's] ability to work if there has been a decrease in the severity . . . of the

impairment(s) present at the time of the most recent favorable medical decision and an increase in [the claimant's] functional capacity to do basic work activities . . ." Id. § 404.1594(b)(3). "A determination that there has been a decrease in medical severity must be based on improvement in the symptoms, signs, and/or laboratory findings associated with [the claimant's] impairment(s)." Id. § 404.1594(b)(1).

"To determine if there has been medical improvement, the Commissioner must compare the medical evidence supporting the most recent final decision holding that the claimant is disabled with new medical evidence." Klaes v. Comm'r of Soc. Sec., 719 F. App'x 893, 895 (11th Cir. 2017) (citing McAulay v. Heckler, 749 F.2d 1500, 1500 (11th Cir. 1985) (per curiam)); see also 20 C.F.R. § 404.1594(c)(1). "[T]here can be no termination of benefits unless there is substantial evidence of improvement to the point of no disability." McAulay, 749 F.2d at 1500. In making such a determination, a "comparison of the original medical evidence and the new medical evidence is necessary to make a finding of improvement." Id.; see also Freeman v. Heckler, 739 F.2d 565, 566 (11th Cir. 1984) (per curiam) (citing Vaughn v. Heckler, 727 F.2d 1040, 1043 (11th Cir. 1984)); Gombash v. Comm'r, Soc. Sec. Admin., 566 F. App'x 857, 859 (11th Cir. 2014). Without such comparison, no adequate finding of medical improvement can occur.

Vaughn, 727 F.2d at 1043. The failure to make such comparison requires reversal and remand for application of the proper legal standard. Id.; Klaes, 499 F. App'x at 896 (noting that if the ALJ fails to evaluate the prior medical evidence and make the comparison to the new medical evidence, courts must reverse and remand for application of the proper legal standard).

In reviewing whether Besecker continues to be disabled, the ALJ is required to follow the sequential evaluation process outlined in the regulations at 20 C.F.R. § 404.1594(f). Where a claimant has been previously determined to be disabled, the question becomes whether he suffers from a continuing disability. In making this determination, the ALJ applies an eight-step analysis to determine continuing disability. The Eleventh Circuit has explained the steps as follows:

> (1) Whether the claimant is engaging in substantial gainful activity;
>
> (2) If not gainfully employed, whether the claimant has an impairment or combination of impairments that meets or equals a listed condition;
>
> (3) If impairments do not meet a listing, whether there has been medical improvement;
>
> (4) If there has been medical improvement, whether the improvement is related to the claimant's ability to do work;

(5) If there is improvement not related to the claimant's ability to do work, whether an exception to medical improvement applies;

(6) If medical improvement is related to the claimant's ability to do work or if an exception applies, whether the complainant has a "severe impairment";

(7) If the claimant has a severe impairment, whether the claimant can perform past relevant work; and

(8) If the claimant cannot perform past relevant work, whether the claimant can perform other work.

See Klaes, 719 F. App'x at 893 (citing 20 C.F.R. § 404.1594(f)(1)-(8)).

The responsibility of weighing the medical evidence and resolving any conflicts in the record rests with the ALJ. See Battle v. Astrue, 243 F. App'x 514, 523 (11th Cir. 2007). Opinions on issues such as whether the claimant is unable to work, the claimant's RFC, and the application of vocational factors, "are not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings dispositive of the case, i.e., that would direct the determination or decision of disability." 20 C.F.R. § 404.1527(d); Bell v. Bowen, 796 F.2d 1350, 1353-54 (11th Cir. 1986).

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. 42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131

(11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion. Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).

The Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner, Bloodsworth, 703 F.2d at 1239, although the Court must scrutinize the entire record, consider evidence detracting from the evidence on which the Commissioner relied, and determine the reasonableness of the factual findings. Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992). Review is deferential, but the reviewing court conducts what has been referred to as "an independent review of the record." Flynn v. Heckler, 768 F.2d 1273, 1273 (11th Cir. 1985).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see 20 C.F.R. § 404.1509 (duration requirement); Barnhart v. Walton, 535 U.S. 212, 223-24 (2002).

Besecker bears the burden of proving that he is disabled, and consequently, is responsible for producing evidence in support of his claim. See 20 C.F.R. § 404.1512(a); Moore, 405 F.3d at 1211. The responsibility of weighing the medical evidence and resolving any conflicts in the record rests with the ALJ. See Battle, 243 F. App'x at 523.

As the finder of fact, the ALJ is charged with the duty to evaluate all the medical opinions of record and resolve conflicts that might appear. 20 C.F.R. § 404.1527. When considering medical opinions, the following factors apply for determining the weight to give to any medical opinion: (1) the frequency of examination and the length, nature, extent of the treatment relationship; (2) the evidence in support of the opinion, such as "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight that opinion is given; (3) the opinion's consistency with the record as a whole; (4) whether the opinion is from a specialist and, if it is, it will be accorded greater

weight; and (5) other relevant but unspecified factors. 20 C.F.R. § 404.1527(b) & (c)(1)-(6).

"[T]he ALJ must state with particularity the weight given to different medical opinions and the reasons therefor." Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1179 (11th Cir. 2011) (citing Sharfarz v. Bowen, 825 F.2d 278, 279 (11th Cir. 1987). Further, the ALJ must give a treating physician's opinion "substantial or considerable weight" absent "good cause." Id. (quotation marks omitted); Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). This is so because treating physicians

> are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c)(2). "This requires a relationship of both duration and frequency." Doyal v. Barnhart, 331 F.3d 758, 762 (10th Cir. 2003). "'[A] medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records.'" Id. (citing Barker v. Shalala, 40 F.3d 789, 794 (6th Cir. 1994). The reasons for giving little

weight to the opinion of the treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated. Phillips, 357 F.3d at 1241. "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error." MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).

"The ALJ may discount the treating physician's opinion if good cause exists to do so." Hillsman v. Bowen, 804 F. 2d 1179, 1181 (11th Cir. 1986). Good cause may be found when the opinion is "not bolstered by the evidence," the evidence "supports a contrary finding," the opinion is "conclusory" or "so brief and conclusory that it lacks persuasive weight," the opinion is "inconsistent with the treating physician's own medical records," the statement "contains no [supporting] clinical data or information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is not accompanied by objective medical evidence." Lewis, 125 F.3d at 1440; Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991) (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)). Further, where a treating physician has merely made conclusory statements, the ALJ may afford them such weight to the extent they are supported by clinical or laboratory findings and are consistent with other evidence as to a claimant's

impairments. <u>Wheeler v. Heckler</u>, 784 F.2d 1073, 1075 (11th Cir. 1986). However, if the decision of the ALJ is explained and relies on evidence in the record it should be upheld. "We will not second guess the ALJ about the weight the treating physician's opinion deserves so long as he articulates a specific justification for it." <u>Hunter v. Soc. Sec. Admin. Comm'r</u>, 808 F.3d 818, 823 (11th Cir. 2015).

## V.    Legal Analysis

### A. <u>Findings of the Administrative Law Judge (ALJ)</u>

The Court begins its analysis by first outlining the ALJ's findings in determining whether Besecker's disability ended on April 1, 2019. Tr. 20. The ALJ "careful[ly] consider[ed] . . . the entire record." Tr. 22. The most recent favorable medical decision supporting a decision that Besecker's disability continued was dated December 21, 2010 – this is "the comparison point decision" (CPD). <u>Id.</u> At that time, Besecker had certain medically determinable impairments: affective/mood disorders and a learning disorder. <u>Id.</u> During the period, Besecker had not engaged in substantial gainful activity as his earnings remained below that point since 2013: "[i]n 2018, he earned $10,313"; the following year "he earned $11,434"; and "[h]e continue[d] to work part time in 2020." <u>Id.</u> From April 1, 2019, Besecker's medically determinable impairments were "bipolar disorder, borderline

intellectual functioning, a learning disorder, and a seizure disorder." Id. These are current impairments. Id.

The ALJ found "no evidence" Besecker "had an impairment or combination of impairments which met or medically equaled the severity of an impairment listed in 20 CFR Part 404.1525 and 404.1526. Id. To satisfy the "paragraph B" criteria, "the mental impairments must result in extreme limitation of one, or more marked limitation of two, of the four areas of mental functioning": "understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." Id.

The ALJ determined Besecker has moderate limitations in understanding, remembering, or applying information. Tr. 23. In September 2019, Dr. Annis conducted an "objective" psychiatric review and determined that despite borderline intellectual functioning Besecker had "full orientation and fair memory" and only a moderate limitation in interacting with others, concentrating, persisting, or maintaining pace. Id. Besecker reported depression and presented with a constricted affect but there was no "significant history of behavioral problems"; he was "able to work part-time in a supermarket deli throughout the relevant period"; and he "lived close to parents and siblings without any significant interpersonal difficulties." Id.

Depression can cause distractibility; and Besecker did have a limited attention span in 2019. Id. However, Besecker admitted he did not comply with his medication regimen. Id. Besecker showed "intact associations without any signs of a thought disorder," was "sufficient[ly] focus[ed] to maintain part time work," and "was able to live independently." Id. Dr. Annis noted Besecker was anxious, but "he otherwise demonstrated fair judgment and normal insight." Id. Besecker "did not suffer significant anxiety exacerbations or panic attacks necessitating inpatient or emergent care during the relevant period." Id.

The ALJ found that Besecker could perform simple tasks  as evidenced by living on his own with his eleven-year-old daughter and having a driver's license, as he testified to at the hearing. Tr. 23. The ALJ found Besecker had moderate limitations in "adapting or managing" himself. Id. Because Besecker's "mental impairments did not cause at least one 'extreme' limitation or two 'marked' limitations, the 'paragraph B' criteria were not satisfied. Id. The ALJ determined that the record does not establish that [Besecker] has only marginal adjustment . . . a minimal capacity to adapt to changes in" his "environment or to demands that are not already part of . . . [his] life." Id.

The ALJ determined that by April 1, 2019, medical evidence showed there was a decrease in the medical severity of Besecker's impairments. Tr. 4. The record reflected mild findings on examination and in Besecker's daily activities: working part-time for many years in supermarket delis, custody and caring for his daughter in his private residence. Id. Besecker can perform simple tasks including "cooking, laundry, dishes, and mowing the lawn." Id. Also, Besecker's brother and his brother's girlfriend live with Besecker, which suggests "no more than moderate social limitations." Id.

The ALJ found that Besecker continued to have a severe impairment or combination of impairments. Id. However, Besecker's sleep apnea does not cause more than minimal limitations in his ability to perform basic work activities; and it improved after CPAP therapy. Id. Besecker is obese, which might affect his physical and mental ability to sustain work activities, but the objective medical evidence showed obesity did not prevent him from working and does not exacerbate his other impairments. Id. Therefore, his obesity is a "non-severe" impairment. Id.

The ALJ determined that, since April 1, 2019, Besecker "had the residual functional capacity (RFC) to perform a full range of work at all exertional levels," excepting certain nonexertional limitations:

> . . . work that does not require him to climb ladders, ropes, or scaffolding . . . no exposure to hazards like open water,

> unprotected heights, and unguarded machinery . . . no operation of motorized equipment or vehicles. He is limited to the simple, routine tasks of unskilled work that require an individual to apply common sense understanding to carry out simple one or two step instructions and deal with standardized situations with occasional or no variables in or from the situations encountered on the job . . . occasional basic interaction with coworkers . . .

Tr. 24. The ALJ considered both Besecker's and his mother's testimonies from the hearing. Tr. 25. Both of them testified that Besecker "would have difficulty sustaining full-time work due to problems with anxiety, anger, and agitation . . .[and] his mother reported that when he works more than 15 hours a week, he starts slamming stuff around." Id. Still, Besecker "testified to conservative treatment of his bipolar disorder with medications" and confirmed working part time in grocery delis. Id. The ALJ considered Besecker's testimony that he had "rather full daily activities," which included living independently across the street from his parents, slicing meat, helping customers, washing dishes at work and at home, doing laundry, mowing the lawn, and preparing meals. Id. As for his seizure history, Besecker testified "he sometimes gets an aura" but admitted he did not have an actual seizure in a year. Id. The ALJ found that Besecker's statements regarding "the intensity, persistence and limiting effects of [these] symptoms are not entirely inconsistent with the objective medical and other evidence." Id.

The ALJ carefully compared the medical evidence. At the time of the

initial eligibility determination, in 2007, Besecker's WAIS[3] test scores were:

- Verbal IQ                   82
- Performance IQ              83
- Full scale IQ              80
- Verbal comprehension    91
- Perceptual organization  82
- Working memory            69
- Processing speed          76

Tr. 26. At the time, Michele Chappuis, Ph.D., assessed Besecker as having "marked restriction" in daily living activities and "marked difficulties in maintaining social functioning." Id.

During the interim period, Besecker was hit by a car in August 2009, which reportedly worsened "his life-long memory problems." Id. He continued mental health treatment. In June 2010, Dr. Baillargeon assessed Besecker with bipolar disorder and suggested Besecker "would be emotionally handicapped indefinitely and certainly for . . . five to 10 years." Id. In December 2010, Dr. Gilliland examined Besecker and found no significant medical improvement; so, Besecker's disability continued. Id.

Next, the ALJ reviewed the subsequent records from the Bridgeway Center, where Besecker was treated for dysthymic disorder and persistent depression. Tr. 26. In 2017, Besecker's IQ assessment was 75. See Tr. 360. The 2018 records from Baptist Medical Group show Besecker was

---

[3] Wechsler Adult Intelligence Scales (WAIS-3). Tr. 324.

diagnosed for anxiety, depression, attention deficit disorder, and had difficulty controlling his anger. Id. By January 2019, Besecker reported he was doing well with no complaints; his mood was "otherwise stable" with Wellbutrin and Topamax; and he reported ongoing part-time work at Winn-Dixie. Id.

In April 2019, Phillip Matar, M.D., and David Tessler, Psy.D., found Besecker was "capable of performing the full range of work at all exertional levels with no climbing of ladders, ropes, or scaffolds, but no other significant physical limitations." Tr. 28. The ALJ noted Dr. Tessler found that Besecker could "remember simple and complex tasks," was able "to maintain attention and concentration for . . . at least two hours," was able "to complete a normal work day and work week"; and, although Besecker's "interaction skills" were "somewhat limited," he was still "capable of performing simple tasks . . . with limited interpersonal contact . . . get[ting] along with co-workers and peers in an appropriate manner without distracting them or exhibiting behavioral extremes," could "accept instructions and respond appropriately to supervision," and "would exhibit moderate limitations adapting to changes"

at work. Tr. 28-29. The ALJ found these opinions "most persuasive" and "consistent with the updated medical" records. Tr. 29.

The ALJ outlined Besecker's treatment after April 1, 2019. Besecker was treated at Bridgeway in August 2019. Tr. 26. He complained of depression and other symptoms but admitted he was non-compliant with his medications. Id. Despite his borderline intelligence, Besecker was fully oriented with fair judgment, normal insight, intact associations, and fair memory. Id. Treatment remained conservative with an adjustment in his medications. Id.

In September 2019, Besecker was evaluated by Dr. Blanchard, his primary care physician; Dr. Gerrish, a state agency physician; and Dr. Annis. Besecker presented to Dr. Blanchard, for reported seizures and tunnel vision. Tr. 27. At the time, he was "substantially noncompliant with his regimen" but was calm and cooperative, answered questions appropriately, and demonstrated intact insight and normal memory. Id. Dr. Blanchard emphasized the need for medication compliance. Id. Dr. Gerrish found Besecker was capable of performing the full range of work at all exertional levels with no certain limitations and opined he should avoid all exposure to hazards, such as machinery and heights given his history of seizures and obesity. Id. Dr. Annis evaluated Besecker's understanding and memory,

attention and concentration, and social interaction and adaptation and found he "is able to perform simple (unskilled) tasks and some more detailed (skilled) tasks that require casual public contact and infrequent changes in routing. Tr. 28. Medical improvement was established. Id.

Around the same time, the electroencephalogram (EEG) results "did not reveal any significant abnormalities." Tr. 27. By October 2019, Besecker "denied any further blackout or staring episodes." Id. Besecker reported that "Topomax controlled his alleged seizure activity." Id. The remainder of the record contained normal findings – gait and station, insight and judgment, full orientation, normal mood and affect, and no obvious deficits in memory or recall. Id. Besecker was "stable on current meds" through May 2020. Id.

In February 2020, Dr. Baillargeon conducted Besecker's psychiatric evaluation. Tr. 29. Besecker's mother attended and said her main concern was whether Besecker would lose his disability benefits. Tr. 26. Besecker "showed an alert and oriented sensorium with goal direct, albeit hesitating, speech." Id. Dr. Baillargeon noticed that Besecker was slightly depressed and had a "somewhat flat" affect, but his memory was intact, and there was no evidence of a thought disorder. Id. Besecker's intellectual capacity was low-average and lacking insight; however, his judgment appeared to be largely intact. Id. Besecker was, apparently, very dependent on his adoptive

parents though he lived independently with his eleven-year-old daughter and spent the majority of his free time playing video games. Tr. 27. The ALJ did not find the opinion persuasive because Dr. Baillargeon evaluated Besecker only once since 2010 and it was inconsistent to find that Besecker could not be employed when his mental status was "unremarkable" and he worked part-time. Tr. 29.

Also, in February 2020, Dr. Thomas treated Besecker for bipolar disorder and intellectual functioning disability twice per year for twelve years. The ALJ found that the physical and mental limitations outlined by Dr. Thomas and his determination that Besecker was unable to work were unsupported by the record particularly because (1) Dr. Thomas provided no treatment for physical or mental problems and documented mild clinical findings and (2) meanwhile, Besecker continued to work part time and cared for his daughter independently. Tr. 30.

The ALJ found the seizure disorder was "well-controlled with medication" and there was no "significant seizure activity during the relevant period." Tr. 30. Besecker's learning disorder and borderline intellectual functioning exist, but the assessed restrictions sufficiently accommodate any mental limitations including distractibility. Id. Again, this was evident when

Besecker worked for a grocery store for years, has custody of his daughter, and lives independently near his parents. Id.

In May 2020, Besecker presented to Neurology Medical Center Clinic complaining of seizures and worsening memory loss but denied recent seizure activity. Tr. 27. He reported an episode several months earlier but denied spells within the past two years, complained of life-long memory loss that worsened over the past year and other mild symptom, but, overall, the findings were largely unremarkable. Id. Besecker demonstrated normal orientation and physical functioning. Id. Dr. Henchey "recommended only an increased dose of Topiramate." Id.

The ALJ found that the overall record showed that Besecker had "grossly normal physical functioning during the relevant period"; and his daily activities (mowing the lawn, household chores, work in a deli) "do not suggest the need for additional physical limitation." Tr. 29. Regarding his "mental residual functional capacity," Plaintiff was limited to "simple, routine tasks of unskilled work" requiring the application of "common sense understanding to carry out simple one- or two step instructions" with occasional variables in the workplace. Id. This would be "sufficient to accommodate any memory or [concentration] problems" related to Besecker's dysthymia-, bipolar-, learning-, and borderline functioning disorders. Id. Besecker's examination

records did not show any significant deficits in memory, thought processes, or orientation; and, despite his complaints of depression and anxiety, he "generally presented as calm and cooperative" and was treated with medication. Id. He did not have "any significant exacerbations or panic attacks during the relevant period. Id.

The ALJ found that Besecker had no past relevant work and had at least a high school education. Tr. 31. The ALJ found he was "able to perform a significant number of jobs in the national economy." Id. The ALJ considered the VE's testimony that Besecker (given his age, education, work experience, and residual functional capacity since April 1, 2019) would be capable of work as a poultry dresser, produce order, and wall cleaner. Id. For these reasons, the ALJ determined that "a finding of 'not disabled'" was appropriate.

According to Besecker, the ALJ's finding is not supported by substantial evidence because the ALJ failed to give proper weight to his medical record, specifically, the opinions of Dr. Baillargeon and Dr. Thomas because they were his primary physicians. ECF No. 14, pp. 3-6. Also,

Besecker argues that the ALJ "could have requested a consultative examination . . . or ordered additional testing." Id., p. 6.

### B. Besecker's Testimony

At the beginning of the hearing, the ALJ admitted Exhibits 1A to 10A, 1B to 18B, 1D to 9D, 1E to 18E, and 1F to 21F. Tr. 48-49. Besecker testified that he was thirty-one years old and received a high school diploma after completing a transitional school. Tr. 49-50. Besecker admitted he worked fifteen to sixteen hours per week for Publix in the deli, where he slices meats and takes the orders from customers. Tr. 50. Prior to Publix, he performed the same kind of work for Winn-Dixie where he was required to do the clean-up and wash pans, but he could not "handle it" and would become angry. Tr. 51. Besecker testified he has custody of his eleven-year-old daughter, lives across the street from his parents, and his younger brother and the brother's girlfriend also live with him. Tr. 52. He and his brother at one time had conflict but that it is "not as bad as it used to be." Id. According to Besecker, his parents control his finances. Tr. 53, 57. Besecker testified he "sometimes" has trouble finishing chores because he is "too distracted" or "can't concentrate." Tr. 54. Besecker can do laundry, dishes, mow the yard, take care of his daughter, and make simple meals. Tr. 54-55. Besecker testified that, if he worked forty hours per week, he would be angry more

often and would be "really agitated." Tr. 55. He claimed he had difficulty controlling his anger even with medication (Topomax, Latuda, and Lexapro). Tr. 56. Besecker also testified that although he has a driver's license he does not drive because he gets angry and agitated. Id. Besecker has not had a seizure for at least one year, although, he felt some "auras" more recently. Tr. 58-59. The auras usually last about thirty minutes. Tr. 59. He must wait for the auras to pass, but, in the meantime, "can't concentrate on anything" and has "to stop what [he is] doing." Id.

C. Sheila Justice's (VE) Testimony

The VE testified that Besecker's work as a "delicatessen worker" is "medium[] and unskilled." Tr. 66. The ALJ posed a hypothetical to the VE,

> assume an individual who is the same age, with the same education . . . the same lack of . . . past relevant work experience, who is limited to unskilled work, that requires an individual just to apply common sense understanding to carry out simple one, or two-step instructions. And, to deal with standardized situations with occasional or no variables in or from the, . . . situations encountered on the job. If there is some infrequent change in work, it would need to be gradually introduced . . . best that he have only occasional non-transactional public contact. And, by that I mean, he might be doing some task where the public could be around, but it's not part of his job to have to interact and provide a service to the public. He can occasionally have basic interaction with coworkers . . . not tandem-task, or group-task, where you're having to work in close conjunction. The supervision style should be just clear and direct. Now, he does have a seizure disorder, which is fairly controlled, but I would place no limitation on the level of, []

> activity. But, I would say that he should do no climbing on
> ladders, ropes or scaffolding, and have no exposure to
> hazards, like . . . open water, unprotected heights,
> unguarded machinery, any operation of motorized
> vehicles. Now, with those limitations, would there be jobs
> that the individual could perform?

Tr. 67. The VE responded, that assuming there were no limitations on the exertional level, "[t]here would be work . . .[as] a poultry dresser . . . produce sorter . . . [and] wall cleaner." Tr. 67-68. The VE also confirmed that if an individual were able to stay on-task with occasional or frequent supervision, he could still retain a competitive job. Tr. 68-69.

Besecker's counsel asked the VE if an individual's employment would be affected if he "frequently" had problems with interacting appropriately with the public, accepting instructions, responding appropriately to criticism from supervisors and changes in work settings, difficulty in completing a normal workday or work week due to psychological symptoms, or perform consistently "without an unreasonable number and length of rest periods." Tr. 70. The VE responded, "he would not be employable in any . . . jobs in the national economy." Id.

D. Besecker's Medical Records

The undersigned carefully reviewed the medical records in this case and summarizes them below in chronological order.

*1. 2007-2010 Medical Records Relevant to the Initial Disability Determination and the Comparison Decision Point.*

In August 2007, psychologist Dr. Russel Thompson, a disability examiner, evaluated Besecker, then eighteen years old. Tr. 322-26. One year earlier, Besecker was admitted to a hospital for "increased aggression." Tr. 322. The record shows that Besecker was diagnosed with "learning disorder, bipolar disorder, and emotional disturbance" and was prescribed Seroquel, Levoxyl, and Protonix. Tr. 322-23. Besecker's attitude was "cooperative"; and his mood and affect were "moderate" and "normal." Tr. 323. His predominate affect was "euthymic," thought process was "goal directed and logical," speech was "normal," and there were no signs of anxiety. Id. Besecker "denied any problems with depression or excessively elevated mood"; had "no suicidal or homicidal ideation"; "was oriented to time, place, and person"; and his judgment and insight were normal. Tr. 322-23.

Dr. Thompson determined Besecker's Full Scale IQ score was 80. Tr. 324. In assessing Besecker's level of functioning, he was able to "perform all dressing, grooming, cooking, [and] cleaning without assistance" but "d[id] not manage his own finances." Tr. 326. Dr. Thompson "judged [Besecker] to be capable of managing his . . . own finances." Id. Besecker's "social functioning" was "normal" -- he socialized with family and friends and related

well to Dr. Thompson. Id. Still, concentration, persistence, and pace were irregular for reading and watching television and problematic for completing projects around the house. Id. Of note, Dr. Thompson concluded there were "two signs of a promising prognosis": (1) Besecker was controlling his temper better and (2) he was enrolled in a job training program. Id.

Two years later, on August 30, 2009, Besecker was hit by a car when crossing a street and was treated at Methodist Children's Hospital in San Antonio, Texas. Tr. 436-49, 441. He suffered contusions to his right arm and right hip but had no head injury. Tr. 436-37. Besecker was assessed as "oriented x3," with no motor or sensory deficits, and a "normal" mood and affect. Tr. 437-38. Besecker's CT scan of his head showed "no signs of acute infarction, hemorrhage or mass lesion . . . ventricles and cortical sulci are normal." Tr. 443. The CT scan was otherwise "unremarkable." Id. Besecker's wrist-, pelvis-, elbow-, hand-, hip-, and chest x-rays were normal. Tr. 444-49.

On September 4, 2009, Besecker presented to Dr. Thomas for an appointment following his emergency room visit. Tr. 458-59. Besecker showed "good judgment and insight"; was "oriented to time, place, and person"; and his mood was "intact" with "no depression, anxiety[,] or agitation." Tr. 459. Dr. Thomas diagnosed Besecker with a concussion and contusions. Id. Over the next few months, on February 1, March 5, and

March 29, 2010, Besecker returned to Dr. Thomas for his car accident injuries. Tr. 453-58. Many assessments resulted in normal findings except for muscle pain, cramps, numbness, tingling, and mild back pain resulting from a hip, pelvic, and back injury. Id.

On May 10, 2010, Besecker presented to Dr. Thomas, for a routine physical examination. Tr. 451. Besecker had "no complaints." Id. His judgment and insight were "intact" and "judg[]ment for everyday activities and social situations [was] within normal limits." Tr. 452. Dr. Thomas noted Besecker's thought processes as "normal, thought content logical, abstract reasoning within normal limits, computation intact for basic mathematical constructs including addition and subtraction"; his mood was "normal" and affect was "appropriate." Id.

On June 10, 2010, Dr. Baillargeon treated Besecker for his bipolar disorder and "Aspergers." Tr. 502-03. Dr. Baillargeon noted Besecker's symptoms were "moderate." Tr. 503. Besecker did not have any "crying or sad spells" or "suicidal thought or attempts." Tr. 502. Besecker was directed to return for a follow-up appointment in "4-6 weeks." Tr. 503. Five days later, on June 15, Dr. Baillargeon wrote a letter addressing Besecker's medical history and condition "to be utilized in a mortgage application process."

Tr. 327.[4] Fifteen years earlier, Dr. Baillargeon referred Besecker to Dr. Tom Martin, a child psychiatrist, who until retirement, treated Besecker for bipolar disorder. Id. Dr. Martin prescribed Depakote, Topomax, and Seroquel, but by 2010, Besecker was off the medications for approximately six months. Id. Besecker was also treated by Janet Grant, MSW, in Dr. Baillargeon's office.[5] Id. Dr. Baillargeon's letter also describes Mrs. Besecker's concerns that her son was "very emotional and impulsive," had "great difficulty getting along with his younger brother"; and she made a specific request for a prognosis. Id. The letter states that Besecker was:

> a well developed male who was alert, cooperative, oriented times three, speech was spontaneous, generally goal directed, there was no evidence of any active thought disorder, affect was appropriate, mood appeared volatile with both anxiety and depression reported, recent and remote memory were largely intact, intellectual capacity was judged to be low average, insight was lacking, judgment was only fair.

Id. Dr. Baillargeon further indicated in the letter that Besecker would "be emotionally handicapped indefinitely and certainly for at least five to ten years" and "recommended that he restart Bipolar medications and continue individual therapy with Janet Grant." Id.

---

[4] Duplicate record at Tr. 501.

[5] Janet Grant treated Besecker from January 13, 2009, through October 25, 2010, for his psychological issues. Tr. 473-95.

The only other records from Dr. Baillargeon are dated July 22; September 23; and November 10, 2010; that is, until 2020. Tr. 497-500. At that time, Dr. Baillargeon noted Besecker's attention, concentration, insight, and judgment was "fair." Tr. 498. Although Dr. Baillargeon's notes show that Besecker's ability to relate to others, sustain work, and respond to change or stress in a work setting was "poor," he opined that Besecker was able to manage benefit payments in his own interest. Tr. 499. No medical records were submitted for review in this case for the subsequent seven-year period.

### 2. 2017-2018 Medical Records

On October 10, 2017, Besecker presented to Bridgeway Center where he was treated by Dr. Sikandar Khan for "anger problems." Tr. 359-60. At the time, Besecker "ha[d] never been able to hold a job for any length of time . . . fe[lt] sad, angry, depressed, having no energy" and had always felt that way. Tr. 359. The record notes "[a]bout 10-15 years ago," Besecker had "problems with anger and a psychiatrist put him on Depakote . . . He stopped seeing that psychiatrist right after that and has been managed by a family doctor in Houston." Id. Besecker had not committed a physical assault in "several years" and "there d[id] not seem to be any manic, hypomanic, or mixed episodes." Id. Besecker admitted he was not compliant with medication and, apparently for the first time, described incidences where he

may "have had a seizure" within the past three or four years but "no incident . . . in the last 10 or 11 months." Id. Dr. Khan noted there was "no psychotic thinking . . . delusions . . . or . . . hallucinations. He is totally oriented," seemed to have "quite low energy and does come across as someone with an IQ of 75." Tr. 360. Dr. Khan noted Besecker had "fair" insight and judgment. Id. Besecker admitted he worked part time. Id. Dr. Khan was "not too convinced about [Besecker's] seizures." Id.

Six months later, on April 9, 2018, Besecker presented to Bridgeway Center and was treated by Kay Whitten, ARNP. Tr. 350. Besecker "transfer[red] from Dr. Khan" who last treated him in December 2017. Id. "He was taking Wellbutrin and Topamax . . . [was] stable . . . feeling fine . . . worked part-time a[t] Winn Dixie . . . denie[d] any mood instability, depression or anxiety . . . psychosis or mania" and was "working towards gaining his independence and living in the home with just him[] and his daughter." Id. Besecker's was diagnosed with "Persistent Depressive Disorder" and "Borderline Intellectual Functioning" and was directed to continue Wellbutrin and Topamax. Id.

On April 16, 2018, Besecker presented to BMPN adult clinic for assessment and medication. Tr. 333-37. Besecker reported "he feels fine . . . is currently under the care of [p]sychiatry for the management [of] either

mood disorder or attention deficit disorder or both." Tr. 333. He had anxiety, depression, and mood problems but had no insomnia, suicidal ideation, or delusions. Tr. 335. Besecker's mood, affect, judgment, and insight were "normal"; and he was oriented as to "person time, and place." Tr. 336. The record notes that Besecker has "a history of attention deficit disorder" and "questionable bipolar history" but his "anxiety and depression may be associated with this." Id. Besecker's "previous loss of consciousness was thought to be secondary to epilepsy disorder." Id. It was also noted that Besecker had difficulty controlling anger. Id. Besecker was "enrolled in" Bridgeway Center's "CSPP Adult" program from October 10, 2017, through September 19, 2018.[6] Tr. 346-48. ARNP Whitten was a member of this treatment team. Tr. 346.

On July 2, 2018, Besecker presented to ARNP Whitten for a follow up appointment. Tr. 349. Besecker was reportedly "doing well . . . still working at Winn-Dixie part-time and takes care of his daughter . . . His medications are working fine . . . denie[d] any depression or anxiety," and was "stable." Id. Besecker was "alert and oriented . . . mood [was] euthymic. Behavior is appropriate. Speech is relevant, linear and goal directed. Attention, focus

---

[6] Previously, Besecker was enrolled in CSPP Children from November 1, 2017, through March 5, 2018. Tr. 351. Medical records for that period can be found at Tr. 353-58.

and concentration are satisfactory." Id. He was directed to continue his medication. Id.

On September 24, 2018, Besecker returned for a follow-up appointment with ARNP Whitten. Tr. 345. Besecker was, again, "doing well . . . t[ook] his meds with good results . . . and denie[d] any depression or anxiety." Id. "[O]ccasionally he will lack motivation for exercise or other activities . . . He still works for Winn Dixie, sometimes up to 30 hours a week . . . lives with his daughter . . . has the support and help of his brother and [parents] to help raise" her. Id. He was "alert and oriented . . . mood [was] calm . . . his affect congruent with mood. His speech is relevant, linear, goal directed. His attention, focus and concentration satisfactory." Id. He was directed to continue his medication regimen. Id.

On November 19, 2018, Besecker returned to ARNP Whitten. Tr. 344. Again, Besecker was "doing well . . . t[ook] his meds with good results . . . [was] still working part time at Winn Dixie and enjoys his job." Id. He was "alert and oriented . . . mood [was] calm . . . his affect congruent with mood. His speech is relevant, linear, goal directed. His attention, focus and concentration satisfactory." Id. Besecker was directed to continue his medications. Id.

### 3. 2019 Medical Records

On January 7, 2019, Besecker returned to APRN Witten. Besecker expressed that "he ha[d] been managing well . . . [was] still working at Winn Dixie and doing well . . . denie[d] any depression or anxiety . . . his mood has remained stable." Tr. 343. Besecker presented as "alert and oriented . . . mood is euthymic. Behavior is appropriate. Speech is relevant, linear and goal directed. Attention, focus and concentration are satisfactory." Id. He was directed to continue his medications. Id.

On April 9, 2019, Besecker presented to the BMPN adult clinic complaining of "cough and congestion." Tr. 330. Notably, Besecker was "negative" for "anxiety, depression, hallucinations, insomnia, mood problems, fearful, suicidal ideation, [and] delusions"; his mood and affect were "normal." Tr. 330-31.

Four months later, on August 12, 2019, Besecker returned to ARNP Whitten. Tr. 339. He claimed he "stopped [his] Wellbutrin" "due to the poor effect." Id. He was still taking Topamax and reported "memory issues" and "poor judgment." Id. He was oriented as to person, place, time, and situation; his mood was "anxious"; and his affect was "constricted." Tr. 340. Besecker's judgment and memory were "fair"; his intelligence level was "borderline." Id. Treatment remained conservative with an adjustment in medication. Id.

On September 3, 2019, Dr. Lawrence Annis, the agency's medical consultant, evaluated Besecker and completed a Mental Residual Functional Capacity Assessment. Tr. 377-80. In most areas of functioning, Dr. Annis found Besecker was not significantly limited. Tr. 377-78. Besecker was moderately limited in his "ability to understand and remember detailed instructions," "carry out detailed instructions," "maintain attention and concentration for extended periods," "complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," "to interact appropriately with the general public," "accepting instructions and respond appropriately to criticism from supervisors," and "respond appropriately to changes in the work setting." Id. Still, Dr. Annis found Besecker "could perform simple (unskilled) tasks and some more detailed (skilled) tasks that require casual public contact and infrequent changes in routine. [Therefore,] [m]edical improvement is established." Tr. 379.

Two days later, on September 5, 2019, Besecker returned to BMPN for "vision concerns," which he attributed to a "seizure disorder." Tr. 393.[7] He admitted that he was under the care of psychiatry with "recent medication

---

[7] This record is duplicated at Tr. 410-12.

changes" but was "substantially noncompliant with his regimen." Id. Besecker was "calm, cooperative" with "intact and normal" insight and cognition. Id. The record notes that "noncompliance represent[s] a hazard to health" and a "probable pseudobulbar affect associated with a seizure disorder." Id.

On September 26, 2019, Besecker presented to Dr. Ruth Henchey for an EEG for his seizures, but no epileptiform activity or seizure activity was seen. Tr. 391. In fact, there were no abnormal findings. Id. On October 1, 2019, Besecker returned to BMPN for his EEG results. Tr. 413. Besecker had "normal" judgment and insight; he was oriented as to "person, time, [and] place"; and his mood and affect were "normal." Tr. 416. He denied having any more blackouts or "dazed spells" since he stopped skipping his Topamax medications. Id. Besecker stated the Topamax takes care of the seizure activity, although, by this time, he had prescriptions for Topamax going back at least nine years. Id. "[N]o seizures or abnormal brain activity [were] noted during [the EEG] test." Id.

### 4. 2020 Medical Records

On February 26, 2020, Besecker – now 30 years old and accompanied by his mother -- returned to Texas to see Dr. Baillargeon who he had not seen in ten years. Tr. 396. Besecker's mother reported that "the main reason

for coming was" he recently lost his Social Security disability benefits and wanted "a re-evaluation in order to facilitate getting the disability payments restarted." Id. Dr. Baillargeon observed Besecker as:

> alert, cooperative, well oriented times 3, speech was halting and hesitating, and generally goal directed. There was no evidence of any active thought disorder. Affect was somewhat flat, mood was slightly depressed, recent and remote memory appeared to be intact, intellectual capacity is judged to be low average, insight is lacking, judg[]ment appears to be largely intact . . .

> appears to be very dependent on his adoptive parents . . . lives next door to his mother in Florida . . . lives with his younger brother . . . [and] . . . daughter . . . The mother states that over the years he never had a full-time employment and that he currently works part-time at a local grocery store. Patient tends to stay inside his home and spends most of his free time playing video games . . .

Tr. 396. Dr. Baillargeon opined Besecker "is not capable of full time nor substantial gainful employment." Id.

The next day, on February 27, 2020, Besecker saw Dr. Thomas to complete the Social Security Residual Functional Capacity Questionnaire. Tr. 398-406. It is worth repeating that there are no records for treatment by Dr. Thomas after May 10, 2010. Nonetheless, Dr. Thomas indicated on the form that he treated Besecker twice per year for twelve years for "intellectual functioning disability/Bipolar I." Tr. 398. There are no treatment dates listed. Dr. Thomas noted "sadness, depression" as symptoms; "flat affect" as a

clinical finding; and "bipolar meds can cause drowsiness." Id. Depression and "instability/Bipolar I" were listed as the "psychological conditions affecting . . . [Besecker's] physical conditions." Tr. 399. Dr. Thomas opined that Besecker was "capable of low stress jobs" but his "intellectual delay . . . inhibits his ability to work [at] a regular job on [a] sustained basis. Tr. 401. Still, Dr. Thomas concluded that Besecker's Bipolar medication "stabilized his behavior some . . . [but] [n]o med[ication] would help his intellectual disorder." Tr. 402. Besecker's prognosis was listed as "poor." Id.

Furthermore, regarding Besecker's "mental abilities and aptitude to do unskilled work," Dr. Thomas checked off that the only area where Besecker had "no useful ability to function" was in "complet[ing] a normal workday and workweek without interruptions from psychologically based symptoms." Tr. 404. In Dr. Thomas' opinion, Besecker was "unable to meet competitive standards" in "remembering work-like procedures and sustaining an ordinary routine without special supervision." Id. Dr. Thomas noted Besecker's IQ was 75 and predicted that, due to his Bipolar and intellectual disorders, Besecker would be absent from work more than four days per month and could only work four hours per day, four days per week. Tr. 405-06.

On April 13, 2020, Besecker returned to BMPN. Tr. 418. Besecker reported that he still did part-time deli work but was working now at Publix.

Id. Besecker also reported that his memory worsened since the 2009 car accident. Id. The record notes that Besecker's judgment and insight were "normal"; he was oriented as to "person, time, [and] place"; his mood and affect were "normal"; and there were "[n]o obvious deficits in memory or recall." Tr. 421. As to the seizure disorder, Besecker reported that psychiatry was refilling his medications except for "gerd and thyroid." Tr. 422. He stated that he did not want to see them anymore and wanted a new psychiatrist. Id. Besecker also reported he had not had a seizure in more than one year. Id.

On May 13, 2020, Besecker went to BMPN for a follow up but he "ha[d] not had labs done yet." Tr. 424. He still worked "at [the] Publix deli part time." Id. Besecker's judgment and insight was "normal"; he was oriented as to "person, time, [and] place"; and his mood and affect were "normal." Tr. 427-28. There were "[n]o obvious deficits in memory or recall." Tr. 428. The assessment indicated that Besecker had not seen psychiatry "in a while," but "he is stable on current meds and will fill" the prescription. Id. Besecker agreed to get his blood work and follow up. Id.

On May 26, 2020, Besecker had a telemedicine appointment with Dr. Ruth Henchey. Tr. 431-34. Dr. Henchey noted that Besecker's seizure activity began four years earlier. Tr. 431. Besecker stated his most recent seizure was six or seven months ago. Id. This is contrary to his report to

BMPN just one month earlier that he had no seizures for more than one year. Tr. 422. Dr. Henchey noted that Besecker lives with his daughter and works part-time at Publix but was "on leave due to Covid 19." Tr. 432. Dr. Henchey assessed Besecker's alertness as "normal"; "his orientation was "[n]ormal for person, place, time, situation"; and his short-term recall was listed as "2/3 does not improve with clues." Id. His affect was "mildly anxious" but "pleasant [and] cooperative." Tr. 433.

E. Whether the ALJ's determination that Besecker was no longer disabled was supported by substantial evidence.

Besecker argues two points, essentially, (1) the ALJ did not afford Dr. Thomas' and Dr. Baillargeon's opinions the appropriate weight and (2) the ALJ could have requested a consultative examination or additional testing. If the ALJ did so, the ALJ would have determined that Plaintiff's disability continued.

As outlined above, the ALJ compared the medical evidence over the years and detailed his findings. Tr. 26-28. The ALJ considered both doctors' opinions that Besecker was not capable of full-time or substantial gainful employment but found those conclusions were inconsistent not only with the medical record but with the evidence as a whole, particularly, because Besecker worked for several years, lived independently, and could care for his daughter. Tr. 29. The records also show that Plaintiff's treatment was

conservative, that at times he was non-compliant with taking medication that worked well for him, and that his impairments were no more than moderate. Dr. Thomas and Dr. Baillargeon's opinions are not entitled to "substantial or considerable weight" for "good cause." Winschel, 631 F.3d at 1179. Here, Dr. Thomas and Dr. Baillargeon had not treated Besecker for ten years. In the interim, Besecker continued his treatment for years with other medical providers, namely Bridgeway Center and BMNP. The record also shows, that the primary reason Besecker returned to Dr. Baillargeon -- and having traveled from Florida to Texas -- was because he lost his Social Security benefits. The opinions that Besecker could not work are inconsistent with the fact that Besecker had been working at a grocery store deli since at least 2018 for periods up to thirty hours per week. Other than being on leave due to COVID-19, Besecker continued to perform the same kind of work at least until the time of his hearing in 2020. Besecker reported to his other treating physicians that he was doing well, he continued to work, and his symptoms were alleviated with proper adherence to his medication regimen. Dr. Thomas –with a ten-year gap in treating Besecker -- cannot provide a "detailed, longitudinal picture" because they simply did not have the frequency required to make an assessment that warranted a greater weight. See 20 C.F.R. § 404.1527(c)(2). Doyal, 331 F.3d at 762. More importantly,

an opinion on whether Besecker is unable to work, his RFC, and the application of the vocational factors are administrative findings reserved to the Commissioner; they are not medical opinions. See 20 C.F.R. 404.1527(d); Bell, 796 F.2d at 1353-54.

The ALJ is not required to order additional consults or testing for Besecker because the record was sufficiently developed. The case of Rothfeldt v. Acting Comm'r of the Soc. Sec. Admin., 669 F. App'x 964 (11th Cir. 2016) is particularly instructive in this case. In Rothfeldt, the ALJ failed to fully and fairly develop the record with IQ testing, as requested by the claimant. The Eleventh Circuit found that an evidentiary gap existed because the claimant had deficits in adaptive functioning, had a fifth-grade education, attended special education classes, was illiterate; and "the only job he held was landscaper for six months" but did not work within the past decade. Rothfeldt, 669 F. App'x at 697. Rothfeldt never had an IQ test.

As outlined above, in a 2007 assessment, Besecker's Full Scale IQ score was 80. Tr. 324. In 2020, Dr. Thomas noted Besecker's IQ was 75. Tr. 405-06. Besecker testified that he completed high school; and he reported to his treating physicians that he held the same type of job for two years. The medical evidence shows that Plaintiff had normal judgment and insight; he was oriented to time, place, and person; and he was calm and

cooperative. The medical evidence shows that Besecker had no incidences of any physical violence or any need for inpatient care since at least 2006. From 2018 forward, he never expressed to his physicians any difficulty maintaining his employment or caring for his daughter. Any challenges he expressed to his treating physicians as it related to his condition were often the result of failing to comply with his medication regimen.

Moreover, the ALJ consulted a vocational expert and specifically asked whether an individual with Besecker's limitations, conditions, and skills could perform any jobs in the national economy. The VE testified that Besecker could still perform work . . .[as] a poultry dresser . . . produce sorter . . . [and] wall cleaner"; and, if he were able to stay on-task with occasional or frequent supervision, he could still retain a competitive job. Tr. 67-69.

Finally, it is worth noting that to qualify for an intellectual disability, Besecker must meet the criteria for paragraph C of § 12.05 by presenting "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." <u>Rothfeldt</u>, 669 F. App'x at 968. Besecker's lowest IQ assessment was 75.

The ALJ did not err in finding that Besecker's medical impairments improved to the point of no disability. As explained above, the ALJ repeatedly

made the comparison to the new medical evidence. Therefore, benefits were properly terminated. Substantial evidence supports the ALJ's determination.

## VI. Conclusion and Recommendation

It is respectfully **RECOMMENDED** that the Court **AFFIRM** the Commissioner's decision because it is supported by substantial evidence and is premised on the proper legal principles. 42 U.S.C. § 405(g); <u>Lewis</u>, 125 F.3d 1439. It is further recommended that the case be **CLOSED**.

IN CHAMBERS at Tallahassee, Florida, on May 25, 2022.

/s/ Martin A. Fitzpatrick
**MARTIN A. FITZPATRICK**
**UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2). A copy of the objections shall be served upon all other parties. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Fed. R. Civ. P. 72(b)(2). Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control. If a party fails to object to the Magistrate Judge's findings or recommendations as to any particular claim or issue contained in this Report and Recommendation, that party waives the right to challenge on appeal the District Court's order based on the unobjected-to factual and legal conclusions. <u>See</u> 11th Cir. Rule 3-1; 28 U.S.C. § 636(b)(1)(C).